HILLMAN/KOHAN EYEGLASSES, INC., A NEW JERSEY CORPORATION, AND ALEXIUS J. FODOR, JR., LICENSED OPHTHALMIC DISPENSER, PLAINTIFFS-APPELLANTS, v. NEW JERSEY STATE BOARD OF OPTOMETRISTS, ADAM K. LEVIN, DIRECTOR OF THE DIVISION OF CONSUMER AFFAIRS, AND JOHN J. DEGNAN, ATTORNEY GENERAL OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 30, 1979—Decided June 19, 1979.

260

Before Judges Conford, Pressler and King.

*Mr. Clive S. Cummis* argued the cause for appellants (*Messrs. Sills, Beck, Cummis, Radin & Tischman,* attorneys; *Messrs. Jerald D. Baranoff* and *Daniel Louis Grossman* on the brief).

*Ms. Pamela Mandel,* Deputy Attorney General, argued the cause for respondents (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by
KING, J. A. D. On this appeal plaintiffs Hillman/Kohan Eyeglasses, Inc. (Hillman/Kohan)., a domestic corporation, and its vice-president, Alexius J. Fodor, Jr., a licensed ophthalmic dispenser of this State, attack *N. J. A. C.* 13 :38–6.1(b), adopted by the New Jersey State Board of Optometrists (Board) on July 21, 1978. The rule states in full:

*N. J. A. C.* 13 :38–6.1   Availability of records

(a) A patient record prepared by an optometrist shall be maintained for seven years from the date of the last entry. The patient record, or a copy thereof, shall be released to another optometrist or physician.

(b) *The contact lens specification is considered a part of the patient record and shall be given only to another optometrist or physician.*

(c) A copy of the patient's prescription for eyeglasses shall be given to the patient or to another optometrist, physician or optician. [Emphasis supplied]

The factual and procedural background necessary for understanding this challenge to the administrative regulation is as follows. Hillman/Kohan does business under the trade name of VISION CENTERS and is a wholly-owned subsidiary of G. D. Searle and Co. It operates outlets for dispensing ophthalmic lenses, eyeglasses and optical appliances in 26 states, including 27 centers in New Jersey. In late 1977 Hillman/Kohan decided to attempt to penetrate the soft contact lens market in New Jersey. As an optical dispenser it

was specifically prohibited from fitting contact lenses. *N. J. S. A.* 52:17B–41.1; see also, *N. J. State Bd. of Optometrists v. Reiss*, 83 *N. J. Super.* 47 (App. Div. 1964). This service must be performed by either an ophthalmologist or an optometrist. The former is a duly licensed physician specializing in care of the eyes and the latter is a profession recognized by statute for the examination of the eye and the prescription of visual aids. *N. J. S. A.* 45:12–1. Prior to the regulation here in question all shared the dispensing function equally.

Under subsection (b) of the questioned regulation an optometrist may provide contact lens specifications only to another optometrist or physician. An optometrist may not provide contact lens specifications to a dispensing optician. The regulation was adopted by the Board pursuant to its power derived from the Legislature to regulate the practice of optometry so as "to promote the safety, protection and welfare of the public." *N. J. S. A.* 45:12–4. Its purpose is to prevent an optician from delivering the contact lenses directly to a patient who might then attempt to fit them into his eyes without the essential attention of an optometrist or physician.

Soft contact lenses are distributed by the manufacturer in pre-sealed, pre-formed and pre-labeled vials. The lenses are ordered pursuant to a prescription derived from the examination by the optometrist or the ophthalmologist. The effect of the questioned regulation is to totally exclude dispensing opticians from the available market for purchasers of contact lenses, unlike the eyeglass prescription which must be given to the patient or the dispensing optician if the patient so desires. *N. J. A. C.* 13:38–6.1(c).

The history of the adoption of this rule is as follows. On November 10, 1977 the Board published a proposed rule relating to the availability of optometric prescription records in 9 *N. J. R.* 538 which stated in pertinent part:

*N. J. A. C.* 13:38–6.1

\*       \*       \*       \*       \*       \*       \*       \*

(b) the patient record, or a copy thereof, shall be released to another practitioner upon a written request of the patient.

(c) A patient is entitled to a copy of his/her prescription for glasses. A patient is also entitled to a copy of his/her specifications for contact lenses; however, the examining practitioner may inform the patient in writing that he assumes no responsibility when the specification is filled beyond the control of the examining practitioner.

Under this version of the proposed rule the patient was permitted to obtain the contact lens prescription with a disclaimer of responsibility. The Board thereafter reconsidered the matter and on March 9, 1978, 10 *N. J. R.* 119, revised the rule in pertinent part as follows:

*N. J. A. C.* 13:38–6.1 Availability of records

(b) The contact lens specification is considered a part of the patient record and shall be given upon written request of the patient, to another optometrist or physician.

(c) A copy of the patient's prescription for eyeglasses shall be given upon request of the patient to the patient or to another optometrist, physician or optician.

On April 12, 1978 a public hearing was held at which the Board considered the evidence on the question. On May 17, 1978 it adopted the proposed March 9 version, 10 *N. J. R.* 352(b), with the addition of the word "only" to subsection (b) which as then amended read:

(b) The contact lens specification is considered a part of the patient record and shall be given upon written request of the patient, only to another optometrist or physician.

The Board adopted the final version of the regulation, depleting the words "upon written request of the patient", and filed it with the Secretary of State on July 21, 1978. *R.* 1978 *d.* 242.

Hillman/Kohan thereafter appealed to this court and sought emergent relief which was denied. On August 17,

1978, on an application for a stay, Justice Schreiber permitted the rule to remain in effect but subject to provisional amendment as follows, pending the appeal to this court:

ORDERED that * * * patient record of contact lens specification shall be released to licensed ophthalmic dispensers by an optometrist, upon written request of the patient, provided that the licensed ophthalmic dispenser shall deliver such contact lens only to an optometrist or physician.

Hillman/Kohan's application for direct certification to the Supreme Court was denied on September 5, 1978, but on the same day the full court granted its motion for a stay of the enforcement of the regulation on the same condition as Justice Schreiber's earlier order. Thus, pending this appeal the patient may purchase contact lenses from an ophthalmic dispenser (optician) who must deliver them *only* to the prescribing optometrist or physician, thereby insuring a return of the patient for fitting.

The evidence presented at the April 1978 public hearing amply sustains the necessity for a rule which compels a fitting visit to the prescribing ophthalmologist or optometrist after the dispensing of the contact lenses. It is obvious from the record that a patient should not be permitted directly to obtain contact lenses from the dispensing optician and attempt to insert them without professional follow-up. For instance, Dr. Jordan Burke, an ophthalmologist and the secretary of the State Board of Medical Examiners, testified that contact lenses are not of sufficient uniform quality to insure that the devices dispensed will not be defective or improperly fitted. He said that the result of a poor fit could be corneal "new vessel" formation, fluid accumulation, abrasions or infections. Dr. William Lesko, the secretary of the New Jersey Academy of Ophthalmology and Otolaryngotomy, testified that a post-dispensing examination was necessary because the use of contact lenses changes the ever-variable shape of the "most delicate and important membrane of the eye—the cornea." While Dr. Lesko agreed

that contact lens manufacturing quality controls were "closely monitored by the Food and Drug Administration," he said there was a great range of tolerance in specifications and quality, thus a margin of fitting error. Because of the clear need for post-dispensing fitting, and sometimes additional follow-up checks, the Board's attempt to prevent the consumer from having direct access to contact lenses without such safeguards withstands Hillman/Kohan's attack. We reject its contention that there is no public health justification for a rule which prohibits the unconditional release of the contact lens specification to the dispensing optician. *Campbell v. Civil Service Dep't*, 39 *N. J.* 556, 562 (1963).

We turn to Hillman/Kohan's contention that the rule as drawn is beyond the power of the Board because it limits the consumer's choice of sellers and diminishes competition without a correlative medical justification. We recognize that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental administrative powers as are necessary to fully effectuate the legislative intent. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N. J.* 544, 562 (1978) ; *In re Heller's Suspension*, 73 *N. J.* 292, 303 (1977) ; *In Review of Health Care Adm'n Bd. v. Finley*, 168 *N. J. Super.* 152, 161 (App. Div. 1979).

As we have stated, the practical effect of *N. J. A. C.* 13:38-6.1(b) is to compel the consumer to purchase the prepackaged contact lenses only from an optometrist or an ophthalmologist. The dispensing optician is thus excluded from the competitive market by a rule of the Board of Optometrists. If we were satisfied that there is a reasonable medical basis for absolutely excluding dispensing opticians from the sale of pre-sealed, pre-formed and pre-labeled contact lenses, we would sustain the regulation as written, but we are not. The important medical consideration is not who sells the contact lenses to the consumer but that they are properly fitted by a qualified professional after purchase.

In *Cole Nat'l Corp. v. State Board of Examiners,* 57 *N. J.* 227 (1970), our Supreme Court held that a regulation of the Board of Ophthalmic Dispensers and Ophthalmic Technicians (opticians) preventing dispensers from practicing in other than their own names bore no reasonable relation to the public purpose of the statute and was invalid. The Court observed that the purpose of the regulatory statute was patently not to immunize licensed dispensers against legitimate competition, thereby granting them exclusive control of the market. *Id.* at 231. The rule was held invalid because its dominant purpose, rather than its incidental impact, was the protection and advancement of the regulator's profession against competition. *Id.* at 233. Such "guild" legislation was not within the Board's statutory power to regulate the profession in the best interest of the public. *Id.* at 233. See also, *Bresler v. Tietjen, Mo.,* 424 *S. W.* 2d 65 (1968), where the Supreme Court of Missouri struck a regulation of that State's Board of Optometry which sought to restrict legitimate competition under the guise of professional regulation.[1]

It must be stressed that contact lenses cannot be manufactured from an eyeglass prescription alone. A number of additional measurements, which can only be legally obtained by an ophthalmologist or optometrist, are included in the contact lens specification. We note with interest that the regulations on the availability of patient records promulgated

---

[1] For an excellent review of the history of the eye care industry and of the mechanics of measuring a patient for contact lenses, see *State ex rel. Londerholm v. Doolin,* 209 *Kan.* 244, 497 *P.* 2d 138 (Sup. Ct. 1972) ; other examples of courts grappling with the administrative regulation of the eye care industry in relation to contact lenses include *Commonwealth, etc. v. Economy Optical Co., Ky.* 522 *S. W.* 2d 444 (Ct. App. 1975) ; *Florida Ass'n of Dispensing Opticians v. Florida State Bd. of Optometry,* 227 *So.* 2d 736 (Ct. App. 1969) ; *State Bd. of Optometry v. Chester,* 251 *Miss.* 250, 169 *So.* 2d 468 (Sup. Ct. 1964) ; *High v. Ridgeway's Opticians,* 258 *N. C.* 626, 129 *S. E.* 2d 301 (Sup. Ct. 1963) ; *cf. State ex rel. St. Bd. of Ex. in Op. v. Kulwald,* 372 *A.* 2d 214 (Del. Ch. 1977).

by the Board of Medical Examiners, and thereby controlling ophthalmologists, require a physician to furnish to the patient, a designated physician or a duly authorized representative of the patient "all pertinent objective data and papers" upon the patient's request. *N. J. A. C.* 13:35–6.12. Physicians are required by the regulations to keep a complete record of any eye examination and make full disclosure of findings to the patient and suggest an appropriate course of action, all upon risk of suspension or revocation of licensure. *N. J. A. C.* 13:35–5.2. The regulation controlling physician-ophthalmologist release of patient records is qualified to the extent that a physician may supply a "partial record * * * where in the reasonable exercise of professional judgment" furnishing the record "would be deleterious to the patient's best interests." *N. J. A. C.* 13:35–6.12. The regulation of the prescribing physician is therefore permissive and permits the exercise of professional judgment in the individual case; the optometrist's refusal under the instant rule is mandated.

The Board of Optometry argues that consumer inconvenience may result if the pre-packaged lenses, as is sometime the case, do not fit properly because of measurement error, anatomical anomaly, fabrication imperfection or other reasons and must be returned to the manufacturer for replacement. From the record before us we see no adequate reason, merely because of this possible inconvenience, for excluding otherwise legally entitled dispensing opticians from the competitive market, thereby compelling the consumer to accept a single-price service-purchase package from the optometric profession. Absent compelling health reasons it should be the consumer's choice whether to suffer possible minor inconvenience as a consequence of the benefits of the competitive market. Counsel for Hillman/Kohan represented at oral argument that lenses purchased from an optician could readily be directly returned by the treating optometrist to the manufacturer for replacement. But even if the unsatisfactory lenses must be rerouted to the manufacturer for replacement through the dispensing optician, which we

doubt, this alone would not justify tolerating an otherwise unjustified monopolistic practice.

■ In determining the extent of the regulatory power over the profession conferred upon the Board of Optometrists for the purpose of promoting the "safety, protection and welfare of the public" pursuant to *N. J. S. A.* 45:12–4 we are also mindful of the Legislature's express declaration of interest in the protection of consumers. When adopting the Consumer Affairs Act of 1971, *N. J. S. A.* 52:17B–118 *et seq., L.* 1971, *c.* 134, the Legislature stated:

> Declaration of policy
> The Legislature recognizes that closer coordination among the various State agencies dealing with consumer affairs will substantially enhance the effectiveness of the State's efforts to adequately protect the interests of New Jersey consumers. Accordingly it is hereby declared to be the public policy of this State to secure the benefits of a uniform and efficient enforcement of the State's public protection laws and administration of consumer affairs throughout the State. All the provisions of this act shall be liberally construed to achieve these ends and administered and enforced with a view to carrying out the above declaration of policy. [*N. J. S. A.* 52:17B–119]

Legislative declarations of public policy in enabling legislation serve as a source for determining the extent of regulatory power. *In re Promulgation of Rules of Practice,* 132 *N. J. Super.* 45, 49 (App. Div. 1974), certif. den. 67 *N. J.* 95 (1975). The declaration of policy in the Consumer Affairs Act is most pertinent to this controversy because that act transferred all functions, powers and duties of the Division of Professional Boards in the Department of Law and Public Safety, including the Board of Optometrists, to the Division of Consumer Affairs. *N. J. S. A.* 52:17B–126.[2] The

---

[2]Shortly before the Consumer Affairs Act was adopted in 1971 the Legislature for the first time provided for the appointment of two non-professional members to the various regulatory boards "to represent the interest of the public," *L.* 1971, *c.* 60, § 2; *N. J. S. A.* 45:1–2.2(b). The Board of Optometrists thus consists of five optometrists and two nonprofessionals.

Boards were to retain their prior statutory powers, see *N. J. S. A.* 52:17B–127, but the regulatory hierarchy specified by the Legislature clearly supports the primacy of consumer interests over the self-interest of the regulated profession.

The Director of the Division of Consumer Affairs has been named a respondent, albeit nominal, on this appeal. At the hearing he registered support for the rule as adopted. However, the Director observed that the Division's "concern has always been the elimination of unreasonable restrictions on the free flow of commercial information that prevent honest and fair competition in the marketplace at the expense of the consumer." He testified further that, unlike eyeglasses, contact lens technology is nascent and a significant danger of improper fitting is posed. The Director did state that the Division would reconsider its support for the rule if it could be shown "that there is some fool-proof method of insuring that a consumer who would have such [direct] access [to contact lenses] would go back to either an optometrist or to an ophthalmologist to make sure that the lenses are properly fitted." The interim condition formulated by the Supreme Court pending this appeal provides just such a method to insure proper fitting by the physician or the optometrist. Since the consumer thereby never personally receives the lenses, the possibility of patient self-fitting is eliminated. The purchaser as a consumer receives the benefit of the competitive marketplace and as a patient is assured proper professional fitting.

The regulation as presently cast denies the consumer this benefit of the competitive marketplace without medical justification and is thus beyond the grant of regulatory power. The regulatory power extends only so far as the health needs of the patient mandate. The regulatory power cannot be used to condone a marketing device which serves solely to lessen or eliminate competition but lacks any concomitant health benefit.

█ It may be conceded that the challenged regulation does facially serve a health-related purpose in that it prevents self-fitting of lenses by patients. However, it does so at the unnecessary and unreasonable price of fostering a guild-like and costly monopoly since, as already noted, the same health purpose can be readily served by a regulatory provision such as that fixed in the Supreme Court's interim order which requires the dispensing optician to send the lenses directly to the prescribing optometrists.

█ We conclude that *N. J. A. C.* 13:38–6.1(b) as adopted by the Board of Optometrists arbitrarily and unreasonably denies to consumers the right to information about themselves and the right to make an informed decision on the purchase of contact lenses in a competitive economic environment.[3] If the Legislature had intended to confer a monopoly upon the profession of optometry for the sale of contact lenses absent medical necessity it no doubt would have precisely said so. Without a specific legislative grant of monopoly, and absent medical justification therefor, we will not infer such a grant.

This court will continue the Supreme Court's interim order for 90 days to permit the Board of Optometrists to either rescind *N. J. A. C.* 13:38–6.1(b) or amend it consistent with the Supreme Court's interim order.

Reversed.

---

[3]The rule may also be subject to the possible criticism that it unjustifiably attempts to regulate the practice of ophthalmic dispensing, which regulatory power has been delegated not to the Board of Optometrists, but to the State Board of Examiners of Ophthalmic Dispensers and Ophthalmic Technicians. See *N. J. S. A.* 52:17B–41.1 *et seq.*, which act specifically prohibits "fitting contact lenses" by opticians but permits without limitation the sale of "all ophthalmic applicances, eyeglasses, or ophthalmic lenses" to the ultimate consumer.