STATE ex rel. STATE BOARD OF
EXAMINERS IN OPTOMETRY,
Plaintiff below, Appellant,

v.

Edwin P. J. KUHWALD, Defendant
below, Appellee.

Supreme Court of Delaware.

Submitted Feb. 12, 1978.

Decided May 16, 1978.

Charles Snyderman, Deputy Atty. Gen., Wilmington, for plaintiff below, appellant.

Henry A. Wise, Jr., Wilmington, for defendant below, appellee.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

HERRMANN, Chief Justice:

This is an appeal from the denial by the Court of Chancery of a petition to enjoin the defendant from engaging in the practice of optometry.[1]

### I.

The Trial Court found the following facts as being undisputed:

"Defendant is an optician who supplies contact lenses pursuant to a prescription written by an ophthalmologist. After receiving the prescription from the ophthalmologist, Defendant performs certain acts in examining and measuring the eye and obtaining data necessary for the preparation of the contact lenses. The lenses are actually prepared by another party (a laboratory) to the specifications of Defendant. Defendant fits the contact lenses and instructs the wearer in their use.

"In fitting the wearer, Defendant makes use of the prescription written by the ophthalmologist which shows the refractive error or correction for spectacles. He uses certain instruments including a corneal microscope, keratometer and keratascope. He also inserts a fluroesciein dye under the eyelid. Defendant also takes the patient's medical history although it presumably has been already taken by the ophthalmologist.

"In order to obtain the data necessary for the Defendant to order the contact lenses from the laboratory certain measurements and computations are made by Defendant.

"Defendant also instructs the wearer in the procedures for handling, inserting and removing the contact lenses. Defendant also advises the wearer to contact him by telephone if any problems occur and to go back to the ophthalmologist for a checkup after he is able to wear the contact lenses for 9 hours. Many patients return to their ophthalmologist, some do not.

"Defendant is licensed as an optician but is not licensed as an optometrist."

Upon the basis of the foregoing facts, and the application thereto of 24 *Del.C.* § 2101(a),[2] the Trial Court concluded

---

1. The opinion below is reported at 372 A.2d 214. For a prior history of this dispute, see *Delaware Optometric Corp. v. Sherwood*, Del. Supr., 128 A.2d 812 (1957); *Moss v. Kuhwald*, Del.Supr., 151 A.2d 516 (1959); and 24 *Del.C.* § 2119 (1964) which provides:

   "The Court of Chancery shall have jurisdiction to issue temporary restraining orders, preliminary injunctions and permanent injunctions to enjoin any violation of this chapter [Optometry Practice Act] in actions brought by the State Board of Examiners in Optometry, the Delaware Optometric Association, Inc., or the Attorney General of the State."

2. § 2101(a), as amended in 1974, provides:

   "The practice of optometry for the purpose of this chapter is defined to be:

that, in applying contact lenses, the defendant was engaged in the practice of optometry under § 2101(a)(3). We agree.

But the Trial Court held that the defendant is exempted from the certification and licensing requirements of the Optometry Practice Act by virtue of the provisions of 24 *Del.C.* § 2117[3] and 24 *Del.C.* 1703(e)(7),[4] because the defendant's services are rendered "under the supervision and control of a physician or surgeon, licensed" under the Medical Practice Act. The Trial Court concluded:

"The two sections of Title 24 Delaware Code must be read together because of the settled rule of law that when the legislature enacts a statute which specifically refers to an existing statute, the later act brings into itself by reference, the terms of the earlier act. * * *

"These two sections must also be read together because 24 *Del.C.* § 1703(e)(7) standing alone is ambiguous and the two sections are in pari-materia. Chapter 17 and Chapter 24 are chapters of the same title of the Delaware Code and both deal with the licensing of health personnel. * * *

"When 24 *Del.C.* § 2117 and 24 *Del.C.* § 1703(e)(7) are read together it is clear that the General Assembly intended to exempt from the provisions of the Optometry Act a person who applies contact lenses as long as he acts under the super-

vision and control of a licensed ophthalmologist. * * * "

## II.

■ We are unable to agree that the defendant is exempt from the certification and licensing provisions of the Optometry Practice Act under either § 2117 thereof, or § 1703(e)(7) of the Medical Practice Act, or both.

The defendant is not exempt under § 2117 for the obvious reason that he is "not licensed to practice medicine and surgery in this State under Chapter 17" (the Medical Practice Act).

And the defendant is not exempt from the requirements of the Optometry Practice Act by reason of § 1703(e)(7) of the Medical Practice Act. The first sentence of § 1703(e)(7) provides, in effect, that an unlicensed person who performs medical, surgical or health services will not be deemed to be practicing medicine in violation of the licensing requirements of Chapter 17 if such services are performed under the supervision and control of a licensed physician or surgeon. The second sentence of § 1703(e)(7) provides that the first sentence was not intended to change or modify legitimate practices prevailing in optometry and ophthalmology at the time § 1703(e)(7) was enacted, i. e., July 5, 1971.

"(1) The diagnosis and/or the examination of the human eye and its appendages; and/or

"(2) The employment of any objective or subjective means or methods for the purpose of determining the refractive powers of the human eyes and/or any visual, muscular or anatomical anomalies of the human eyes and their appendages, or any ocular deficiency; and/or

"(3) The prescribing and/or application of lenses, prisms, contact lenses, orthoptics (visual training), or any physical, mechanical or psychovisual therapy for the correction, remedy or relief of any insufficiencies or abnormal conditions of the human eyes and their appendages."

3. § 2117 of the Optometry Practice Act provides:

"Nothing in this chapter shall be construed to prevent the sale and/or application of spectacles in the ordinary course of trade, provided

no part of this chapter is violated by this exemption.

"Those persons having the degree of Doctor of Medicine or Doctor of Osteopathy and licensed to practice medicine and surgery in this State under Chapter 17 of this title shall be exempt from this chapter."

4. § 1703(e)(7) of the Medical Practice Act provides:

"(e) Nothing contained in this chapter shall prevent:

\* \* \* \* \* \*

"(7) Any person from rendering medical, surgical, or health services, if such services are rendered by such person under the supervision and control of a physician or surgeon, licensed under this chapter. Nothing herein shall be construed to change or modify legitimate practices currently prevailing in the practice of optometry or ophthalmology."

The intent of the General Assembly in enacting § 1703(e)(7) appears in the purpose clauses of 58 *Del. L.* c. 212 as follows:

> "WHEREAS, it has been recognized by physicians and by laymen that there is a shortage of medical personnel, and that many persons possess backgrounds and training which could qualify them for training as physician's assistants; and

> "WHEREAS, the introduction of the concept of a physician's assistant has been challenged as 'practicing medicine' without the appropriate license; and

> "WHEREAS, it is the purpose of this Act to provide a means by which paramedical personnel, such as nurses, physician assistants and others performing limited medical services may be utilized in freeing physicians of time-consuming chores more easily handled by the paramedical personnel."

It thus clearly appears that the defendant's situation is governed by § 2117, the specific Statute applicable to the practice of optometry, and not § 1703(e)(7), a general Statute authorizing unlicensed "paramedical personnel, such as nurses, physicians assistants and others" to perform "limited medical services". This result is impelled, too, by the general statutory scheme of Title 24 regulating various health-related professions and occupations. To construe the various licensing laws of Title 24 as being in *pari materia* with § 1703(e)(7) and, on that basis, conclude as did the Trial Court that unlicensed persons can lawfully perform under supervision all health-related services including those which require licensing under Title 24, would mean this: anyone working under a licensed physician's supervision could not only practice optometry without a license but could also lawfully perform without a license any of the services which, under the various Chapters of Title 24, constitute: the practice of podiatry (Chapter 5); the practice of chiropractic (Chapter 7); the practice of dentistry and oral hygiene (Chapter 11); the practice of nursing (Chapter 19); the practice of pharmacy (Chapter 25); the practice of physical therapy (Chapter 26); the practice of psychology (Chapter 35); the practice of speech

pathology and audiology (Chapter 37); and even the practice of medicine, surgery and osteopathy (Chapter 17). The various activities comprising each of these professions can hardly be categorized as "limited medical services" and "time-consuming chores". See 58 *Del.Laws*, c. 212, *supra*. Obviously, § 1703(e)(7) may not be permitted to have any such result.

The Trial Court found in the second sentence of § 1703(e)(7) the basis for a conclusion that an injunction against the defendant's present activities would be inappropriate in view of the Court's finding that the defendant could lawfully perform, in 1971 when § 1703(e)(7) was enacted, the optometric services which he is now performing. The purpose and meaning of the second sentence of § 1703(e)(7) is obscure. Suffice it to say that § 2117 was enacted in 1974 and, as the later and more specific Statute, § 2117 prevails, to the point of implied repeal, over any irreconcilable inconsistency in § 1703(e)(7).

In the final analysis, the defendant's situation is governed solely by § 2117, and under that Statute it is manifest that he has no exemption from the licensing requirements of the Optometry Practice Act.

In view of the foregoing conclusion, we do not reach the question of whether the defendant's presently impermissible activities were lawful in 1971 when § 1703(e)(7) was enacted.

### III.

The Trial Court held that, although without license or exemption, the defendant "would be entitled to continue his activities because an attempt by the Delaware General Assembly to absolutely prohibit Defendant from providing medical services under the supervision and control of a physician would be unconstitutional" under *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

In *Roe*, the United States Supreme Court ruled that the decision by a physician and his patient as to whether an abortion should be performed is protected by the Federal

Constitution under the right of personal privacy. The Court went on to attach "fundamental rights" status to the right of personal privacy, and stated that it could not be regulated by the state unless there was a "compelling state interest." Based upon *Roe*, the Trial Court ruled that, in the absence of a compelling state interest, a physician cannot be prohibited from "utilizing an optician under his supervision and control to help him furnish contact lenses to a patient."

■ We are of the opinion that the Trial Court misinterpreted *Roe v. Wade*, and erred in attaching "fundamental rights" status and the "compelling state interest" test to the facts in this case. First, *Roe* creates no right of privacy to which the defendant may lay claim. It appears that the defendant has no more standing to claim *Roe* rights than the prospective abortionist in *Roe* would have had.

■ Moreover, the question here is not whether a physician and patient can decide, without state interference, whether a patient should have certain medical treatment; the question is whether a physician and patient can decide, without state interference, who can perform such medical treatment. This question does not fall under the constitutional right of privacy; it falls under the unquestionable power of the state to adopt reasonable qualifications and licensing requirements "to protect the health of the general public from the incompetent practice of optometry." *Delaware Optometric Corp. v. Sherwood*, Del. Supr., 128 A.2d 812 (1957).

In *Williamson v. Lee*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), the Supreme Court considered the constitutionality of an Oklahoma statute which made it unlawful for a person who was not licensed as an optometrist or ophthalmologist to fit or duplicate spectacle lenses without a prescription from an optometrist or ophthalmologist. In upholding the constitutionality of that Statute, the Court stated:

"The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. . . . [T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

Accordingly, we hold that neither deprivation of license or of exemption will violate any constitutional right of privacy of the defendant.

## IV.

■ The long career of the defendant and his fine reputation among the physicians with whom he worked and who testified on his behalf, warrants the following pertinent statement of the Supreme Court of Missouri which we quote with approval:

"We are sensitive to the fact that in many fields of medicine physicians and surgeons customarily use the services of ancillary lay assistants and allied health personnel, without whose assistance they could not meet the public need for health services or function as effectively as they can with their assistance. We know from this record that ophthalmologists customarily delegate to lay technicians the performance of services for their patients which we have found to constitute the practice of optometry. We recognize that Dale Curteman and the Curteman employees have been in the business for years; that their proficiency in the field is recognized by outstanding physicians; that their services are said to be important as a practical matter in meeting the needs of the public, and that our holding will interfere with many existing established customs and practices. Where established customs and practices are challenged and found to run counter to plain and unambiguous language of controlling regulatory statutes such customs and practices must give way to the law, which this Court must declare as it is and not as some would prefer that it had been writ-

**1282**

ten. If it is desirable as a matter of public policy that capable and proficient lay technicians be authorized to practice optometry by assisting ophthalmologists and optometrists in the performance of the acts and the making of the decisions necessary to provide the public with contact lenses, that authority must come from the General Assembly and not by way of judicial legislation." *State ex inf. Danforth v. Curteman, Inc.*, Mo.Supr., 480 S.W.2d 848, 858 (1972).

\* \* \* \* \* \*

Reversed and remanded for further proceedings consistent herewith.